FILED
2012 Feb-06  PM 01:33
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **LV MEADOWS,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| **vs.** | ) | |
| | ) | Civil Action Number |
| **AMERICAN BOTTLING** | ) | **2:10-cv-2317-AKK** |
| **COMPANY, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court are Defendant American Bottling Company, Inc.'s ("ABC") motion for summary judgment, doc. 33, motion to strike portions of the Declaration of Anquan Lewis, doc. 44, motion to strike portions of the Declaration of Plaintiff LV Meadows ("Meadows"), doc. 45, and motion to strike the Declaration of Matt Crane, doc. 47. For the reasons stated more fully herein, the court **GRANTS** ABC's summary judgment motion as it relates to the race discrimination claim regarding mileage reimbursements and the retaliation claims, but **DENIES** ABC's summary judgment motion in all other respects. The court **DENIES** in part ABC's motions to strike the Anquan Lewis and Matt Crane Declarations and **DENIES** in part as moot ABC's motions to strike these Declarations. The court also **DENIES** as moot ABC's motion to strike portions of Meadows' Declaration.

A Pretrial Conference will be held in the Chambers of the Undersigned on **March 22, 2012 at 1:30 P.M. at the Hugo L. Black U.S. Courthouse in Birmingham, Alabama**. This case is set for jury trial on **May 14, 2012 at 9:00 A.M. at the Hugo L. Black U.S. Courthouse in Birmingham, Alabama**.

## I.    STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.   FACTUAL AND PROCEDURAL BACKGROUND

This litigation arises from Meadows' employment with ABC at its Bessemer, Alabama facility. Meadows, an African-American male, began work with ABC on April 5, 2006 as an "Account Manager." Doc. 33-1, at 13. ABC later changed his title to "Area Sales Manager," but Meadows generally performed the same job functions throughout his employment. Doc. 43-2, at 20; doc. 34, at 3. As an Account Manager, ABC issued Meadows a route book containing sales accounts within a specific geographic territory. Doc. 33-5, at 28. Meadows' customer accounts generally included large retail chains and members of the

American Merchandising Association Buying Group ("AMA"). *See* doc. 33-12, at 5. While the parties agree that ABC compensated Meadows on a guaranteed salary plus commissions basis, *see* doc. 33-12, at 5, the parties heavily dispute the precise nature of Meadows' job duties. ABC contends that Meadows primarily engaged in the direct "sale" of ABC products by taking orders from customers while also servicing ABC customer accounts. *See e.g.*, doc. 33-13. Meadows, on the other hand, asserts that he never actually consummated a sale because ABC maintained prearranged sales contracts with its customers. As such, his duties consisted primarily of servicing accounts by taking preauthorized orders from customers and stocking or merchandising products for sale to the ultimate consumer. *See e.g.*, 33-2, at 1; doc. 41-2, at 10.

Around September of 2008, in response to a new bottling sub-distributor in the Birmingham area, doc. 33-12, at 1-2, ABC changed the routes and sales accounts of its Account Managers. The parties agree that Meadows lost some accounts but gained others as a result of the route changes. *See* doc. 34, at 9; doc. 40, at 25. However, Meadows alleges that his previous route book contained sales accounts in predominately white neighborhoods, and that, after the rerouting, ABC predominately assigned him to sales accounts in African-American neighborhoods and predominately assigned the sales accounts in white neighborhoods to white Account Managers. *See* doc. 41-1, at 5-6. ABC disputes this allegation and contends that it designed and assigned the new routes such that each Account Manager would have an equal volume of sales based on projected numbers. *See*

doc. 33-12.

On July 1, 2009, after a performance-related meeting with branch manager Shawn Lay and district manager Erik Dokka, Meadows filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC").  Doc. 33-11, at 16.  Four months later, on November 5, 2009, Meadows arrived late for a sales meeting.  Doc. 33-7.  Although Meadows claims that he notified district manager Dokka that he may be late, nonetheless, Dokka informed Meadows that he needed to see Meadows after the meeting.  A confrontation between Dokka and Meadows began, and Dokka asked Meadows to leave the meeting.  Meadows refused to do so until Ron Blair, the area director and vice president, intervened. *Id.*  Meadows' combative and confrontational conduct at the meeting and previous instances of misconduct caused ABC to suspend Meadows for three days, without pay, beginning on November 18, 2009.  Doc. 33-5, at 37.  However, ten days before his suspension, Meadows wrote a letter to Blair, Joe Rowland, Human Resources, the EEOC, and the NAACP complaining about a discriminatory work environment and citing the November 5, 2009 incident.  *Id.* at 35-36.

Meadows took a leave of absence due to anxiety attacks on March 10, 2010. *See* doc. 33-3, at 17.  Meadows attempted to return on July 12, 2010, *id.* at 15, but presented ABC with medical restrictions including no warehouse work and no more than one manager talking to him at a time.  *Id.* at 17.  ABC claimed that it could not accommodate Meadows' restrictions because Meadows' position required participation in sales meetings in which more than one manager may be

present.  *See* doc. 33-16, at 4.  Accordingly, Meadows remained on leave until February 11, 2011, when ABC terminated Meadows.  *Id.*[1]

Meadows filed suit against ABC and Dr. Pepper Snapple Group on August 26, 2010.  Doc. 1.  Originally, Meadows alleged race discrimination and retaliation under Title VII and 42 U.S.C. § 1981, *id.* at 3-9, violations of the Family and Medical Leave Act ("FMLA"), *id.* at 9-12, and violations of the Fair Labor Standards Act ("FLSA"), *id.* at 12-13.  Subsequently, the court granted Dr. Pepper Snapple Group's motion to dismiss for lack of personal jurisdiction because Meadows failed to oppose this motion.  Doc. 14.  Meadows also voluntarily dismissed his FMLA claims with prejudice.  Doc. 35.  As a result, the only claims remaining against ABC are the race and retaliation claims under Title VII and § 1981 and the FLSA claim.  ABC moved for summary judgment on all the remaining claims.  Doc. 33.  After Meadows responded, doc. 40, ABC filed motions to strike specific portions of Anquan Lewis, Meadows, and Matt Crane's Declarations, all of which Meadows filed in opposition to summary judgment. Docs. 44, 45, 47.  The four motions are fully briefed, *see* docs. 40, 46, 49, 50, and are ripe for review.

### III.   ANALYSIS

Meadows asserts two separate theories of liability for both his race

---

[1] Meadows is not challenging the termination in this lawsuit.  Meadows filed this suit on August 26, 2010, doc. 1, before his ultimate termination from ABC, and has not subsequently amended his complaint.  *See also* doc. 40, at 30-32.

discrimination and retaliation claims.  First, Meadows contends that ABC discriminated against him by its (1) 2008 redistributing of sales accounts and (2) mileage reimbursements for Account Managers.  Second, Meadows asserts that ABC retaliated against him for challenging the alleged discrimination by (1) suspending him on November 18, 2009 and (2) refusing to allow his return to work in July of 2010.  Finally, Meadows contends that he is not subject to the FLSA's "outside sales exemption," and, as such, he is entitled to recover overtime wages.  The court addresses each claim in turn.

A.      *Race Discrimination*

Meadows' Title VII and § 1981 race discrimination claims, doc. 1, at 3-6, "have the same requirements of proof and use the same analytical framework;" therefore, the court "shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010) (holding that the Eleventh Circuit "routinely and systemically group[s] Title VII and § 1981 claims for analytic purposes").  Title VII "makes it unlawful for an employer to 'discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race.'"  *Brown v. Ala. Dep't Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (quoting 42 U.S.C. § 2000e-2(a)(1)).  Implicit in a claim for race discrimination is the contention that racial animus factored in the adverse employment action at issue.

"[A] plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence.  The analytical framework and burden of production varies depending on the method of proof chosen." *Standard*, 161 F.3d at 1330.

Where, as here, a plaintiff relies on circumstantial evidence to show discriminatory intent, *see* doc. 40, at 24, the court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under the *McDonnell Douglas* framework, the plaintiff must first create an inference of discrimination by establishing a *prima facie* case of discrimination. *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citation omitted).  If the plaintiff satisfies his initial burden, "then the defendant must show a legitimate, non-discriminatory reason for its employment action." *Id*. (citation omitted).  "If it does so, then the plaintiff must prove that the reason provided by the defendant is a pretext for unlawful discrimination." *Id*. (citation omitted).  However, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Springer v. Convergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007) (citation omitted).

Furthermore, to demonstrate a *prima facie* case for race discrimination, "the plaintiff must show that: (1) []he is a member of a protected class; (2) []he was subjected to an adverse employment action; (3) h[is] employer treated similarly situated employees outside of h[is] protected class more favorably than []he was

treated; and (4) []he was qualified to do the job." *Burke-Fowler*, 447 F.3d at 1323.

Assuming such a *prima facie* case is made, and the defendant provides a

legitimate, non-discriminatory reason for the adverse employment action, to show

pretext, the plaintiff must "cast sufficient doubt on the defendant's proffered

nondiscriminatory reasons to permit a reasonable factfinder to conclude that the

employer's proffered 'legitimate reasons were not what actually motivated its

conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)

(quoting *Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).  "The

district court must evaluate whether the plaintiff has demonstrated such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

the employer's proffered legitimate reasons for its action that a reasonable

factfinder could find them unworthy of credence."  *Id.* (quotation marks and

citations omitted).

  i. *The September 2008 Reroute Assignments*

  The gravamen of Meadows' discrimination claim, as it relates to ABC's

2008 reassignment of sales accounts, is that ABC transferred Meadows to a

predominately African-American, and less lucrative, geographic area which

adversely affected his compensation.  Doc. 1, at 4; doc. 40, at 25.  The parties

agree that ABC redistributed its sales accounts thereby rerouting its Account

Managers and that this rerouting caused Meadows to lose some previously held

accounts, but gain other accounts.  *See* doc. 34, at 9; doc. 40, at 6.  Meadows states

that before the 2008 reroute, 70% to 75% of his accounts were located in

predominately white neighborhoods in metropolitan Birmingham, and that, after the new assignments, it was the exact opposite—60% to 65% of his accounts were in predominately African-American sections of metropolitan Birmingham.  Doc. 41-1, at 5-6.  Meadows admits that ABC redistributed his lost accounts to both white and African-American employees, but he submits that "white employees received the portions of my accounts that were in white neighborhoods while the African-Americans received accounts that were in predominately black neighborhoods."  *Id.* at 6.  Additionally, Meadows contends that "the accounts in the black neighborhoods were not as lucrative as the accounts in the white areas." *Id.*  Specifically, Meadows states that ABC's September 2008 rerouting replaced his "good stores" with "dead" or "dried up" territory.  *See* doc. 33-2, at 27-28.  As such, absent the rerouting, Meadows argues that his commissions would have increased.  *Id.* at 30.

Given this testimony, Meadows establishes a *prima facie* case for racial discrimination.  As an African-American, Meadows is a member of a protected class, and ABC arguably subjected him to an adverse employment action by reassigning him to less lucrative accounts in predominately African-American neighborhoods.  Moreover, taken in the light most favorable to Meadows, ABC reassigned similarly situated white employees to the more lucrative, predominately white, neighborhoods—including accounts Meadows previously cultivated before the rerouting.  *See* doc. 41-1, at 5.  *See also Burke-Fowler*, 447 F.3d at 1323.  At the summary judgment phase and for purposes of potential racial discrimination in

the 2008 rerouting, the court finds that the white Account Managers—Steven Cottrell, Jason Wallace, and Bobby Hilton—performed "the same type of tasks" as Meadows and were "similarly situated in all relevant respects." *Sumerlin v. AmSouth Bank*, 242 F. App'x 687, 690 (11th Cir. 2007) (citations and quotation marks omitted).  Consequently, with the purported rerouting along racial lines, at the very least, Meadows raises a reasonable inference of discrimination. *See Miller v. Bed, Bath & Beyond, Inc.*, 185 F. Supp. 2d 1253, 1264 (N.D. Ala. 2002) ("It is well established that making work assignments along the lines of race or color is forbidden under Title VII and § 1981.").

However, in response, ABC asserts legitimate, non-discriminatory reasons for the new assignments. *See* doc. 34, at 6-11.  Shawn Lay, former branch manager of ABC's Bessemer facility, provided that a newly contracted sub-distributor in the Birmingham area created the need for the September 2008 rerouting.  Doc. 33-12, at 1-2.  Lay contends that ABC's rerouting procedure consisted of loading "a list of all the sales accounts within the Bessemer sales territory into a Map Point computer program," loading "the previous twelve months of sales for each account into the program," and re-drawing sales routes while "attempting to keep the accounts within a route as geographically close as possible, but also taking into consideration the total volume for each route." *Id.* at 2. As such, Lay based the rerouting on geography, but he also attempted "to end up with all Account Managers being compensated on average approximately $33,000 [and] the spread between Account Managers no greater than

approximately $2,000." *Id.* Along with rerouting territorial assignments and sales accounts, Lay changed the commission structure for "take home" beverages and "single serve" beverages. *Id.* at 2-3. Lay incorporated these commission changes into the projected compensation for each new route. *Id.* at 3. Based on the newly-assigned routes and Lay's projected compensation data, ABC projected Meadows to earn the second most amongst the Account Managers. *Id.* at 3-4. Finally, Lay asserts that he "did not consider Account Managers' race when revising routes and moving sales accounts" and he "did not group sales accounts according to the racial makeup of the neighborhoods in which the stores are located." *Id.* at 7.

Based on Lay's affidavit, doc. 33-12, ABC satisfies its burden of demonstrating a non-discriminatory justification for any potential adverse employment actions arising from the September 2008 rerouting. Accordingly, the burden shifts back to Meadows to "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1538 (quotation marks and citation omitted). The court finds that Meadows satisfies his burden at the summary judgment phase by presenting evidence about ABC's alleged favorable treatment of Steven Cottrell. *See* doc. 41-2. Specifically, Anquan Lewis, another African-American Account Manager, stated that, in May or June of 2008, he "was reassigned to service accounts on the west side of Birmingham, Alabama which consisted of stores in predominantly, if not all, African-American neighborhoods. The reason

given to me for this change was that a white employee [Steven Cottrell] was afraid to work accounts on the west side of Birmingham, Alabama because of the high rate of crime committed by African-American residents in those areas.  Mr. Cottrell was then given my old route in the predominantly white areas of metropolitan Birmingham." *Id.* at 3.[2]  "'Language not amounting to direct evidence, but showing some [discriminatory] animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case.'"  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (quoting *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.4 (11th Cir.1998) (alteration in original)).  A jury could reasonably interpret Lewis' statement, as corroborated by Meadows' deposition, *see* doc. 33-2, at 23-24, as evidence of disparate treatment based on discriminatory attitudes against African-Americans.[3]  Assuming that a

---

[2] ABC moved to strike this statement "because it is hearsay pursuant to Federal Rule of Evidence 801(c) because it is offered to prove the truth of the matter asserted."  Doc. 44, at 2. The court finds this argument unpersuasive and **DENIES** ABC's motion to strike this statement as hearsay.  The statement is not offered for the truth—that Cottrell, in fact, feared African-American residents in the west side of Birmingham—rather, it is offered to show alleged discriminatory animus by ABC management.  Additionally, ABC contends that this statement is irrelevant because "Lewis does not identify the individual who allegedly made these comments," and as such, "there is no way to establish the speaker was a management official or that the statement was made in the course and scope of the speaker's employment." doc. 50, at 4. However, Meadows corroborates these actions as being made by Shawn Lay, the former branch manager of ABC's Bessemer facilities, *see* doc. 33-2, at 23-24, and, accordingly, the statement also qualifies as an alleged admission against interest.  As such, it meets one of the hearsay exemptions.  *See* Fed. R. Evid. 801(d)(2).  The court finds this evidence admissible and reminds ABC that it will have a full opportunity to cross-examine both Meadows and Lewis on this matter at trial.

[3] To aid in the discrimination claim, Meadows also submits the Declaration of Matt Crane, doc. 41-2, at 11, who states that, in September or October of 2007, ABC general sales

jury credits Lewis and Meadows' testimony, it could reasonably find that ABC's 2008 rerouting discriminated against African-Americans by reassigning the African-American Account Managers to routes in predominantly African-American neighborhoods, thereby allowing the white Account Managers to operate in the purportedly "more lucrative" and less dangerous geographic areas. Accordingly, as it relates to the alleged racial discrimination in the September 2008 rerouting, ABC's motion for summary judgment is **DENIED**.

ii.     *Mileage Reimbursement Rate*

Meadows, however, fails to establish a *prima facie* case for race discrimination as it relates to ABC's mileage reimbursement rates.  As previously stated, when alleging circumstantial evidence of racial discrimination, the plaintiff must first demonstrate a *prima facie* case of discrimination.  Included in the *prima facie* elements for discrimination is evidence of a similarly situated employee, outside of the plaintiff's protected class, who the employer treated more favorably. *Burke-Fowler*, 447 F.3d at 1323.  This "comparator" must be "similarly situated in all relevant respects," and "nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson*, 376 F.3d at

---

manager Ron Blair made a disparaging racial comment about African-American Account Manager Richard Pope.  ABC moved to strike this statement in the Crane affidavit.  Doc. 47.  As it relates to the Ron Blair comment, the court **DENIES** ABC's motion as moot.  The court finds sufficient evidence to preclude summary judgment on the racial discrimination charge against ABC concerning the 2008 rerouting without considering the purported Ron Blair comment.  If this matter proceeds to trial, the court will revisit the admissibility of Crane's testimony on this issue in the event ABC raises an objection.

1091 (citation and quotation marks omitted).

Meadows contends that Andy Higgins is the relevant comparator here and that Higgins' "mileage check should not have been in excess of Meadows[']" because Higgins only serviced Meadows'[] large format accounts such as Wal-Mart and Food World," "Higgins did not have to service Meadows'[] convenience stores and other small retailers," and "Meadows had to visit his large formal accounts twice a day while Higgins only visited them once a day."  Doc. 40, at 12, 26 (citing doc. 41-1, at 7).  However, Meadows admits that Higgins is a "Merchandiser," not an Account Manager, and the court finds insufficient evidence that these two employees are similarly situated.  *Id.  See also Celotex Corp.*, 477 U.S. at 322 (summary judgment warranted where, after ample time for discovery, party fails to establish an essential element of its case).  Meadows fails to provide that he and Higgins perform the same job duties, and in fact, Meadows' description of Higgins' employment reveals different job functions.  *See* doc. 40, at 12, 26.  While different employment "titles" are not necessarily dispositive, Meadows presents the court with no evidence that a Merchandiser and Account Manager require equal skill, effort, and responsibility.  *See Walton v. Cowin Equip. Co., Inc.*, 774 F. Supp. 1343, 1346 (N.D. Ala. 1991) (explaining the considerations that should be utilized to determine if two positions are "substantially similar").  At most, Meadows presents evidence that he and Higgins drove different mileages per week.  *See* doc. 40, at 26 (citing doc. 33-16, at 88-117).  This does not establish a *prima facie* case that ABC treated Higgins more

favorably or that Higgins is a satisfactory comparator.  As Meadows and Higgins are not similarly situated, the court cannot properly compare their "mileage checks" because to do so would invade ABC's ability to compensate different types of employees at different levels.  *See Wilson*, 376 F.3d at 1091. Accordingly, the court **GRANTS** ABC's motion for summary judgment as it relates to the discrimination claims regarding Meadows' mileage checks.

B.    *Retaliation*

Meadows also brings claims for retaliation under Title VII and 42 U.S.C. § 1981.  Doc. 1, at 6-9.  Again, the analysis for Title VII and § 1981 retaliation claims is identical.  *See Standard*, 161 F.3d at 1330; *Bryant v. Jones*, 575 F.3d 1281, 1301 (11th Cir. 2009) (holding that § 1981 does encompass a private right of action for retaliation); *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1211 (10th Cir. 2008) ("The test for establishing a prima facie case for retaliation is the same under both Title VII and 42 U.S.C. § 1981.").  Moreover, the *McDonnell Douglas* framework also applies to retaliation claims under Title VII and § 1981.  *See Bryant*, 575 F.3d at 1307.  Under this framework, the plaintiff must first demonstrate a *prima facie* case of retaliation by showing that: "(1) [plaintiff] engaged in a statutorily protected activity; (2) [plaintiff] suffered an adverse employment action; and (3) [plaintiff] established a causal link between the protected activity and the adverse action."  *Id.* at 1307-08.  After the plaintiff demonstrates a *prima facie* case, the burden then shifts to the defendant "to rebut the presumption by articulating a legitimate, non-discriminatory reason for the

adverse employment action." *Id.* Finally, assuming the defendant provides a non-discriminatory justification, "the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions." *Id.* at 1308.

Here, Meadows alleges two separate charges of retaliation: (1) the November 18, 2009 suspension and (2) ABC's refusal to allow Meadows to return to work in July, 2010. *See* doc. 1, at 6-9; doc. 40, at 29-32. However, Meadows failed to sustain his burden on either contention.

i.    *November 2009 Suspension*

Meadows contends that, on November 18, 2009, ABC retaliated against his July 1, 2009 filing of an EEOC charge and November 8, 2009 complaint to Ron Blair, vice president of ABC's Bessemer facility, by suspending him unjustifiably for three days, *see* doc. 40, at 29-30; doc. 33-11, at 16; doc. 33-5, at 35-36. It is undisputed that suspension without pay is an adverse employment action. *See Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008) (holding that the proper standard to determine an "adverse employment action" is whether the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination"). It is also undisputed that lodging a complaint with internal management or the EEOC is a statutorily protected activity. *See Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001) ("Statutorily protected expression includes internal complaints of [] harassment to superiors as well as complaints lodged with the EEOC."). However, ABC maintains that

Meadows fails to establish a sufficient causal connection between the protected activity and the adverse employment action.  Additionally, ABC argues that it suspended Meadows for legitimate, non-discriminatory reasons.  Doc. 34, at 26.

While the court finds a *prima facie* case of retaliation pertaining to the November 2009 suspension, the court also finds that Meadows insufficiently refutes ABC's proffered legitimate, non-discriminatory reasons for this suspension.  The Eleventh Circuit construes the "causal link" element to "'require merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated.'" *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1278 (11th Cir. 2008) (quoting *Simmons v. Camden Cnty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985)).  "'In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action.'" *Id.* (quoting *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)).  Here, Ron Blair, the ABC management agent suspending Meadows, knew of both Meadows' July 1, 2009 EEOC charge against ABC and Meadows' November 8, 2009 letter complaining to Blair about potential discrimination in the work place.  *See* doc. 33-5, at 33-36.  Moreover, the suspension occurred a mere ten days after Meadows' letter to Ron Blair.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (finding that causation may be shown by temporal proximity).  Accordingly, Meadows provides a statutorily protected activity, an adverse employment action, and a causal nexus between the two.

ABC, on the other hand, contends that it suspended Meadows for legitimate, non-retaliatory reasons.  *See* doc. 34, at 26; doc. 46, 9-10.  In the November 18, 2009 suspension letter from Blair to Meadows, Blair states:

> On Thursday afternoon, November 5, 2009, you were late for a sales meeting.  Upon your arrival at the meeting, Eric Dokka, District Sales Manager, informed you he wanted to meet with you following the sales meeting.  You immediately become [sic] argumentative, combative and confrontational in the presence of your coworkers.  Despite Dokka's repeated instructions to calm down, you continued your behavior.  Finally, Dokka instructed you to leave the meeting to which you refused to comply.  When I arrived at the meeting, you continued your argumentative and combative behavior with me.  Only when I instructed you to leave the meeting did you comply and leave the meeting.
>
> This is not the first incident of improper behavior on your part.  On October 13, 2009, you became hostile on the phone with Jason Wallace, District Sales Manager, when he called you to make sure you were in route to service a customer's store.  Your actions in that incident were inappropriate, unprofessional, and clearly warranted disciplinary action.  However, the Company chose to forgo discipline in that matter given the fact you apologized to Wallace for your behavior and assured the Company such contact would not occur in the future.

Doc. 33-5, at 37.  Indeed, Meadows' deposition testimony substantially corroborates this conduct.  Meadows asserts that around 3:00 or 3:30 p.m. on November 5, 2009, he called Dokka to state that he might be late to the 4:00 p.m. sales meeting due to work obligations.  Doc. 33-3, at 7.  Dokka said "fine" and Meadows arrived at 4:08 p.m.  At that time, Meadows claims that the meeting had not yet started, but when it did start, Dokka said that he needed to talk with

Meadows, Anquan Lewis, and Richard Pope afterwards. *Id.* Meadows immediately inquired into the substance of this discussion rather than wait until the end of the sales meeting, and Dokka replied that he planned to write Meadows up for his tardiness. *Id.* Meadows explained his objections to this write-up based on the 3:30 p.m. phone call to Dokka, and Dokka asked Meadows to leave the meeting. Meadows continually refused to do so. *Id.* at 8. Finally, Meadows asserts that he left the meeting only after Ron Blair intervened. *Id.*

Based on Meadows' actions at the November 5, 2009 sales meeting, the court agrees that ABC offers a legitimate, non-retaliatory justification for suspending Meadows thereby satisfying its "exceedingly light" burden. *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). An employer may discipline its employees for noncompliant or disruptive behavior, and courts must not interfere with these business decisions, absent a reason to do so. *See e.g.*, *Leeth v. Tyson Foods, Inc.*, No. 10-14849, 2011 WL 6371795 (11th Cir. Dec. 20, 2011) (holding suspension without pay constituted a legitimate, non-retaliatory response when plaintiff refused to perform a temporary assignment); *Penn v. USF Holland, Inc.*, 770 F. Supp. 2d 1211, 1241-42 (N.D. Ala. 2010) (finding termination a legitimate, non-retaliatory action where plaintiff verbally refused to perform day-to-day tasks requested by his supervisors). Taking all reasonable inferences in Meadows' favor, Meadows still admits to being openly insubordinate to his supervisor Erik Dokka during the November 5, 2009 sales meeting. *See* doc. 33-3, at 7. While Meadows claims he never raised his voice or cursed, he

also states that he was insubordinate:

> Q [John Eaton, counsel for ABC]: Okay.  And so your boss was telling you you need to leave the sales meeting and you told him, no, I'm not leaving the sales meeting, right?
> A [Meadows]: I told him I need to be here for the sales meeting.
> Q: Okay.  And so your boss is telling you to do something and you're telling him I'm not going to do what you say?
> A: I'm saying I need to be here for the sales meeting, yes, sir.
> Q: Okay.  And so he told you to get out and you told him no?
> A: Right.  That's it.

*Id.* at 8.  Based on this insubordination, and the undisputed evidence that Meadows previously made unprofessional comments to Jason Wallace, a district sales manager, *see* doc. 33-5, at 37, a reasonable jury could find ABC's disciplinary suspension of Meadows legitimately warranted.  *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.").

As ABC offers legitimate reasons for suspending Meadows, "the presumption of retaliation disappears."  *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1061 (11th Cir. 1999).  Accordingly, Meadows "bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reasons provided by [ABC are] a pretext for prohibited retaliatory conduct." *Goldsmith*, 513 F.3d at 1277.  Indeed, where "the proffered reason is one that might motivate a reasonable employer," *Chapman*, 229 F.3d at 1030, the plaintiff "must meet the reason[] proffered head on and rebut it."  *Crawford v. City of*

*Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).

Here, Meadows fails to meet his burden.  Instead, to establish pretext, Meadows merely contends that a "jury could conclude that defendant took Meadows' tardiness on this one occasion as an opportunity to unjustly discipline him."  Doc. 40, at 30.  This allegation of pretext is simply insufficient as a matter of law especially since the adverse action here is a suspension for insubordination, as opposed to a write-up for tardiness.  Moreover, even if Meadows believed that Dokka's proposed write-up was retaliatory, nothing in the law gives Meadows the right to respond in a belligerent and insubordinate manner.  Critically, Meadows neglects to meet ABC's proffered justification of discipline for disruptive behavior "head on," and rather, Meadows only provides a conclusory statement of retaliation.  In short, because Meadows offers no evidence of pretext regarding this legitimate disciplinary action, Meadows fails to demonstrate that a reasonable jury could, in fact, conclude that ABC's actions masked unlawful retaliation. Therefore, the court **GRANTS** ABC's summary judgment motion on the November 18, 2009 suspension claim.

ii.   *Refusal to Return Meadows to Employment with ABC*

Meadows also asserts a claim for retaliation under Title VII and § 1981 based on ABC's refusal to allow Meadows to return to his previously held position in July 2010.  *See* doc. 40, at 14-15, 30.  Meadows contends that on March 10, 2010, he "requested and was granted a leave of absence to get well," doc. 40, at 15; however, when he attempted to return to work on July 12, 2010, ABC

purportedly stated that it "could not accommodate his restrictions of only one manager talking to him at a time and no warehouse work," *id.* at 31. Meadows concludes that such "reasons are a smoke screen for retaliation." *Id.* While not explicitly argued in his response, *see generally* doc. 40, the court infers that Meadows asserts the following *prima facie* case for this theory of retaliation: Meadows engaged in the statutorily protected behavior of filing a complaint with the EEOC on July 1, 2009 and filing an internal complaint on November 8, 2009; ABC retaliated by refusing to allow Meadows' return to work on July 12, 2010; and a causal connection exists between the two. *See* doc. 1, at 9.[4]

The court finds that Meadows fails to properly allege a *prima facie* case for retaliation because no causal connection exists between the EEOC or internal complaint and this adverse employment action. "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Cooper Lighting*, 506 F.3d at 1364. In other words, a plaintiff can demonstrate circumstantial evidence of causation if the adverse employment action occurs relatively quickly after the protected expression. *Id.* However, ABC contends that the twelve month span between Meadows' EEOC complaint and this adverse employment action "is insufficient to establish causation, as a matter of law." Doc. 34, at 24. Although ABC did not

---

[4] The court is prohibited from inferring that the "protected conduct" at issue here is Meadows' use of the Family and Medical Leave Act ("FMLA") because Meadows voluntarily dismissed his retaliation claim under the FMLA. Doc. 35.

explicitly argue this point, presumably ABC also maintains, for the same reasons, that the eight month span between Meadows' internal complaint and the adverse action is similarly insufficient to establish causation. The court agrees because in *Cooper Lighting*, the Eleventh Circuit provided that "mere temporal proximity, without more, must be 'very close.'" 506 F.3d at 1364 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). Moreover, a "three to four month disparity between the statutorily protected expression and the adverse employment action is not enough," and "in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Id.* Thus, here, "temporal proximity" cannot support the causation element for Meadows' theory of retaliation.

In an attempt to overcome the temporal deficiency, Meadows argues that "in the absence of temporal proximity, a plaintiff may establish the causal link by offering additional evidence of retaliation," and "circumstantial evidence of a pattern of antagonism *following* the protected conduct can give rise to an inference of retaliation." Doc. 40, at 28 (emphasis added) (citing *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010); *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173 (3d Cir. 1997); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-25 (3d Cir. 1997)). However, these cases fail to support Meadows' argument that a causal connection exists here. In *Brown*, the plaintiff lacked temporal proximity for the causation element, but she offered other evidence suggesting that her

employer failed to promote her in direct retaliation for her testimony against the employer in separate litigation. 597 F.3d at 1182. Specifically, the plaintiff claimed that a manager told her that she would not receive the promotion because "her participation in *Reynolds* [the other litigation] had caused her to be 'labeled as a troublemaker.'" *Id.* at 1171. Yet, the Eleventh Circuit found this evidence "wholly generalized and plainly insufficient to establish liability" under the causation element of a retaliation claim. *Id.* at 1182.

In *Kachmar*, the Third Circuit held that courts should allow discovery regarding possible patterns of antagonism even if there is no temporal proximity from the face of the complaint. 109 F.3d at 177. The court found a sufficiently well-pled claim for retaliation, but this case is limited to its facts as alleged by the plaintiff before discovery. *Id.* at 179. Finally, in *Woodson*, the employee alleged a pattern of antagonism leading up to his termination and produced evidence that: (1) the employer set the plaintiff up to fail by placing him in a poorly performing division with inadequate resources, (2) neglected to appropriately respond to racist graffiti in its facilities, and (3) terminated plaintiff pursuant to a "sham ranking process performed by individuals who were not familiar with his employment record, but only with his charges of discrimination." 109 F.3d at 921.

Thus, while Meadows correctly states the applicable law, he fails to provide the court with sufficient circumstantial evidence linking his EEOC or internal complaint with the July 12, 2010 adverse employment action. In fact, Meadows neglects to demonstrate any purported "pattern of antagonism" following his

protected expression, and he fails to even address the application of *Brown*, *Kachmar*, and *Woodson* to the facts at hand.  Instead, after ample time for discovery, Meadows still offers only conclusory statements supporting a *prima facie* case for retaliation.  However, this unsupported allegation lacks the clear factual pattern of antagonism seen in *Woodson*, and similar to *Brown*, the court is left with contentions "wholly generalized and plainly insufficient to establish liability."  597 F.3d at 1182.  Moreover, taking all *reasonable* inferences in the light most favorable to Meadows, the only potential evidence of such antagonism is the November 18, 2009 suspension.[5]  Yet, as discussed *supra*, ABC had legitimate, non-retaliatory reasons for such suspension.  Therefore, Meadows fails to establish a genuine issue of material fact regarding his retaliation claim based on the failure to reinstate him in July 2010.

Alternatively, even if Meadows did make out a *prima facie* case, which he does not, his claim still fails because he neglects to rebut ABC's legitimate, non-

---

[5] While not argued by Meadows, this court acknowledges that the court in *Woodson* held that "an atmosphere of condoned racial harassment in a workplace increases the likelihood of retaliation for complaints in individual cases."  109 F.3d at 922 (citations and quotation marks omitted).  Accordingly, under *Woodson*, the September 2008 "rerouting" incident discussed *supra* and Matt Crane's affidavit testimony regarding a racially disparaging comment made by Ron Blair in September or October of 2007, doc. 41-2, at 11, *could arguably*—though perhaps not reasonably—be considered circumstantial evidence of the required causal connection.  However, the court finds that these two separate incidents in 2007 and 2008 fail to establish "an atmosphere of condoned racial harassment" in the ABC workplace.  Moreover, this circumstantial evidence is too tenuous to support a logical causal connection between Meadows' July 2009 EEOC complaint and ABC's refusal to accommodate Meadows in July 2010.  Accordingly, as it relates to the retaliation claim, the court **DENIES** ABC's motion to strike the declaration of Matt Crane as moot.

retaliatory reasons for such action—i.e., ABC simply could not guarantee that only one manager will meet with Meadows because sales meetings typically are conducted by multiple managers. *See* doc. 33-15, at 6 (Meadows' Fitness-For-Duty Certification stating the following restrictions: "with only 1 manager in meeting at one time, no warehouse work (he's a salesman"). *See also* doc. 33-15, at 2-3 (affidavit of current branch manager for ABC stating that "[e]very Account Manager/Area Sales Manager is required to attend weekly sales meetings. Two and sometimes three District Sales Managers, and the Branch Manager, attend the meetings."). To refute this non-retaliatory reason, Meadows offers his deposition testimony that the Fitness-For-Duty Certification actually restricted ABC from: "put[ting] me in a room and two managers talking to me at one time, coming at me, that['s what] ma[de] me nervous." Doc. 33-3, at 19. However, Meadows admits that, in July 2010, he only presented ABC with the actual Fitness-For-Duty Certification, and he neglected to offer any further explanation of the doctor's written instructions. *Id.* at 19-20. In other words, at the time of the purported retaliation, ABC only knew of the restrictions listed on the Certification paper, which it reasonably could not accommodate. Again, Meadows fails to meet ABC's proffered non-retaliatory justification head on, and accordingly, fails to meet his burden of showing that this reason is pretext for unlawful retaliation. *See Crawford*, 482 F.3d at 1308.

For these reasons, the court **GRANTS** ABC's motion for summary judgment on the retaliation claim premised on the failure to reinstate Meadows in

July 2010.

C.    *FLSA*

Finally, Meadows claims that ABC improperly classified his employment position as an exempt employee under the FLSA's "outside sales exemption;" therefore, Meadows asserts entitlement to overtime pay.  Doc. 1, at 12-13.  ABC contends that Meadows' position as an Account Manager squarely fits within this exemption, and thus, summary judgment is warranted.  *See* doc. 34, at 27.

"The FLSA includes several exemptions from its minimum wage and overtime requirements.  One of those exemptions is contained in § 213(a)(1) of the statute and exempts any employee employed in the capacity of an outside salesperson, as defined by the Secretary of Labor."  *Gregory v. First Title of Am., Inc.*, 555 F.3d 1300, 1302 (11th Cir. 2009) (citing 29 U.S.C. § 213(a)(1)).  The regulations applicable to this exemption are found in 29 C.F.R. § 541, and these regulations, "promulgated pursuant to an express delegation of legislative authority, are to be given controlling weight unless found to be arbitrary, capricious, or contrary to the statute."  *Gregory*, 555 F.3d at 1302.  Moreover, "a FLSA exemption must be narrowly construed so that it applies to those plainly within its terms and spirit."  *Id.* (citing *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1364 (11th Cir. 1997)).  Accordingly, the "employer bears the burden of showing its entitlement to the exemption."  *Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009); *see also Gregory*, 555 F.3d at 1302.

The term "outside sales employee" is defined as any employee:

(1) Whose primary duty is:

(i) making sales within the meaning of section 3(k) of the Act, or

(ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

(2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a). The regulations also define "primary duty" as:

[T]he principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a). Moreover, the regulations add that when defining an employee's primary duty:

[W]ork performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.

29 C.F.R. § 541.500(b). *See e.g.*, *Ackerman v. Coca-Cola Enter.*, 179 F.3d 1260, 1266-67 (6th Cir. 1999) (after noting "that the parties have not challenged the district court's conclusion that the plaintiffs were employed for the purpose of selling Coca-Cola products," the court discussed the "incidental to and in conjunction with" regulation).[6]   Perhaps most importantly, the regulations provide precise definitions of "promotion work."  29 C.F.R. § 541.503.  Specifically, the pertinent regulation states:

> Another example is a company representative who visits chain stores, arranges the merchandise on shelves, replenishes stock by replacing old with new merchandise, sets up displays and consults with the store manager when inventory runs low, but does not obtain a commitment for additional purchases. The arrangement of merchandise on the shelves or the replenishing of stock is not exempt work unless it is incidental to and in conjunction with the employee's own outside sales. Because the employee in this instance does not consummate the sale nor direct efforts toward the consummation of a sale, the work is not exempt outside sales work.

*Id.* at § 541.503(c).  Finally, the Labor Department's regulations provide examples regarding the possible exemption of "drivers" who serve a dual role as sales representatives.  *See* 29 C.F.R. § 541.504(c).  While Meadows is not technically labeled a "driver" by ABC, these regulations offer relevant considerations:

(c) Drivers who may qualify as exempt outside sales employees

---

[6] ABC heavily relies on this case based on the assumption that Meadows' "service" functions are incidental to and in conjunction with his "sales" functions. *See* doc. 34, at 29-30. However, in *Ackerman*, the parties did not dispute that the employee regularly engaged in the activity of selling Coca-Cola products. 179 F.3d at 1266.  In contrast, here, Meadows adamantly refutes the proposition that he *actually sells* ABC's products.  Doc. 40, at 20 ("Meadows *only* serviced accounts where sales had been prearranged.") (emphasis added).

include:

(1) A driver who provides the only sales contact between the employer and the customers visited, who calls on customers and takes orders for products, who delivers products from stock in the employee's vehicle or procures and delivers the product to the customer on a later trip, and who receives compensation commensurate with the volume of products sold.

(2) A driver who obtains or solicits orders for the employer's products from persons who have authority to commit the customer for purchases.

(3) A driver who calls on new prospects for customers along the employee's route and attempts to convince them of the desirability of accepting regular delivery of goods.

(4) A driver who calls on established customers along the route and persuades regular customers to accept delivery of increased amounts of goods or of new products, even though the initial sale or agreement for delivery was made by someone else.

(d) Drivers who generally would not qualify as exempt outside sales employees include:

(1) A route driver whose primary duty is to transport products sold by the employer through vending machines and to keep such machines stocked, in good operating condition, and in good locations.

(2) A driver who often calls on established customers day after day or week after week, delivering a quantity of the employer's products at each call when the sale was not significantly affected by solicitations of the customer by the delivering driver or the amount of the sale is determined by the volume of the customer's sales since the previous delivery.

(3) A driver primarily engaged in making deliveries to customers and

> performing activities intended to promote sales by customers
> (including placing point-of-sale and other advertising materials, price
> stamping commodities, arranging merchandise on shelves, in coolers
> or in cabinets, rotating stock according to date, and cleaning and
> otherwise servicing display cases), unless such work is in furtherance
> of the driver's own sales efforts.

*Id.* Given the applicable law and regulatory standards, the court finds a genuine

issue of material fact exists regarding Meadows' primary duties as an "Account

Manager" for ABC.

ABC presents evidence in an effort to demonstrate that Meadows' primary

job duties as an Account Manager consisted of sales as defined by 29 C.F.R. §

541. Specifically, ABC offers a document describing the "essential duties and

responsibilities" of an "Area Sales Manager." Doc. 33-5, at 28. These duties

include "[p]rospect and develop accounts in a predetermined territory in order to

sell product, place vendors, racks, etc." and "[t]ravels through assigned territory to

call on regular customers to solicit orders or talks with customers on sales floor or

by phone." *Id.* Moreover, ABC offers Shawn Lay's affidavit stating that ABC

"expected its Account Managers to increase sales at sales accounts within their

assigned routes, and to prospect and develop accounts within their route territory."

Doc. 33-12, at 5. Lay also states that to "provide motivation to increase sales,

Account Managers were compensated on a commission basis, with a minimum

guaranteed salary." *Id.* ABC based commissions on "monthly sales quotas," *id.* at

6, and Meadows admits that, as an Account Manager, he could feasibly fail to

meet the quota or exceed the monthly sales quota. Doc. 33-2, at 1. Meadows

further testified that he "took orders in the accounts," *id.* at 13, but contends that taking orders did not actually consummate the sale of product because such orders had to be "authorized." *Id.* at 12.

ABC also provides Ron Blair's affidavit in which he asserts that Account Managers/Area Sales Managers "can (and do) increase their sales volume, and therefore increase their commissions, in multiple ways." Doc. 33-13, at 2. For large retail chains, "ABC has negotiated contracts with the chains which provide authorization for certain products, and promotional activities schedules which provide[] special retail pricing to the ultimate consumer - the contracts do not guarantee any sales volume amounts." *Id.* at 3. Accordingly, Blair contends that Account Managers must "take advantage of sales and his selling abilities to persuade the local stores to provide the AM/ASM with additional display area, so that the AM/ASM can increase the sales volume, thereby increasing commissions." *Id.* Moreover, "[l]arge retail chain store managers also have the authority to refuse a request from an AM/ASM for additional display space." *Id.*

Blair provides that for AMA customers ("a group of independent Gas and Convenience Store Owners"), "ABC has an assigned Manager that calls on the AMA Board to negotiate a yearly agreement/contract." *Id.* For these accounts, the agreement "only requires its member stores to provide ABC with benefits such as shelf space for products and to carry a certain minimum number of products." *Id.* at 4. The AMA agreement "does not require AMA member stores to purchase a certain amount of product, or prevent the stores from carrying additional

products," *id.*; accordingly, it "is the ASM/AM who consummates the sales." Finally, for independently owned grocery or convenience store accounts, "ABC does have programs/contracts that an independent account can qualify for better pricing if the account commits to certain performance driven requirements," but "[s]elling in these contracts to the independent accounts is the responsibility of the AM/ASM." *Id.*  ABC ultimately contends that such evidence pertaining to Meadows' purported sales-related duties makes Meadows' argument "that he did not engage in sales . . . implausible," and as such, Meadows' FLSA claim fails as a matter of law.

However, Meadows presents evidence from which, if considered credible, a reasonable jury could conclude that any "sales efforts" were in fact incidental to his primary duties of servicing accounts.  In other words, Meadows counters that his primary duties focused on servicing customers because ABC management actually consummated the sales with these customers.  *See* doc. 40, at 18. Meadows testified that, for large chain and AMA customers, he served as a "service manager."  Doc. 33-1, at 25.  More specifically, Meadows stated: "I was told to go in and service the store, sir.  That's all I was told to do.  And I had a guideline for AMA, Wal-Mart, CVSs and things of that nature.  That's all I was told, and that's what I stuck to.  They had – I had monthly pamphlets that came out, and I just stuck to that.  If it called for a display, I built the display.  If it called for a two liter rack, I put the two liter rack."  *Id.* at 25-26.  In regard to AMA accounts, Meadows testified that "everything was preset and pre - - pre-

everything.  Everything was already set." *Id.* at 35.  Moreover, when asked how

"servicing" could increase sales volume, at, for example, Wal-Mart, Meadows

explained:

> So, went[sic] you left you filled the display - - you filled display.
> During your route, you got to - - you come back - - back again within
> a two- or three-hour period.  You see that - - that display is - - is - - is
> fizzling down, going down.  Go in the back, get some more product
> and put it out on the shelf . . . . [Y]ou might come back to the Wal-
> Mart four times just to make - - because it's a big sale.  And every
> time you go in the back, you make sure you get everything out of the
> back and put it on the shelf and keep it stocked.

Doc. 33-2, at 1.

Furthermore, Meadows offers the Declaration of Matt Crane regarding

Meadows' job duties.  Crane, a former district sales manager with ABC, provided

that "Account Sales Managers['] duties did not include the selling of product.

Whenever an Account Sales Manager thought that new business or an existing

customer might want to start an account or wanted more of [ABC's] product they

would contact the district sales manager who would go to the potential customer

and make the sale."  Doc. 41-2, at 10.[7]  Ultimately, if this testimony is credited, a

reasonable jury could conclude that Meadows' primary duty consisted of servicing

---

[7] While the court agrees with ABC that Crane's personal knowledge is limited because he resigned from ABC on August 31, 2007, *see* doc. 47, at 5, Crane's statement still provides relevant information regarding Meadows' employment and primary job duties.  Furthermore, ABC admits that Meadows "performed the same duties from the day he was hired until the last day he actively worked."  Doc. 34, at 3.  As such, a jury is more apt to weigh Crane's credibility and determine the probative value of arguably out-dated information.  Moreover, at trial, ABC may use Crane's lack of personal knowledge during cross-examination.  For these reasons, the court **DENIES** ABC's motion to strike Crane's affidavit as it relates to this statement.

ABC's customer accounts because ABC management and the customer prearrange the actual "sales."[8]  For example, depending on the facts adduced at trial, a reasonable jury may find that Meadows is a "company representative who visits chain stores, arranges the merchandise on shelves, replenishes stock by replacing old with new merchandise, sets up displays and consults with the store manager when inventory runs low, but does not obtain a commitment for additional purchases."  *See* 29 C.F.R. § 541.503(c).  Stated simply, a genuine issue of material fact exists as to Meadows' "primary duties" as an Account Manager for ABC.  A resolution of this factual dispute will establish whether Meadows is exempt from the FLSA's overtime provisions under the "outside sales exemption."  Therefore, the court **DENIES** ABC's motion for summary judgment as it relates to the FLSA claim.

## IV.   CONCLUSION

Based on the aforementioned reasons, this case is set for trial on Meadows' Title VII and § 1981 claims regarding ABC's September 2008 rerouting and his FLSA claim.

---

[8] ABC moved to strike as hearsay Meadows' affidavit statement that "I was told by company management that I could not deviate from these pre-arranged sales agreements that had already been negotiated by ABC in advance of my servicing the accounts." Doc. 41-1, at 4; doc. 45, at 2.  The court finds summary judgment precluded on the FLSA claim without considering this statement, and therefore, **DENIES** the motion to strike as moot.

DONE the 6th day of February, 2012.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE